# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-11466 (MFW)<br><br>(Jointly Administered) |
| CENTER CITY HEALTHCARE, LLC, d/b/a HAHNEMANN UNIVERSITY HOSPITAL, PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC, ST. CHRISTOPHER'S HEALTHCARE, LLC, and SCHC PEDIATRIC ASSOCIATES, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>MEDLINE INDUSTRIES INC.,<br><br>Defendant. | Adv. Proc. No. 21-50920 (MFW) |

**BRIEF IN SUPPORT OF MEDLINE INDUSTRY INC.'S
MOTION FOR SUMMARY JUDGMENT**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), St. Chris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 216 North Broad Street, 4th Floor, Philadelphia, Pennsylvania 19102.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

SUMMARY OF MATERIAL FACTS .................................................................................. 2

ARGUMENT ......................................................................................................................... 4

    I.    SUMMARY JUDGMENT STANDARD. ................................................................. 4

    II.    MEDLINE IS ENTITLED TO SUMMARY JUDGMENT ON ALL OF PLAINTIFFS' CLAIMS. ............................................................................................ 5

        A.    Medline's Objective Ordinary Course Defense Covers $1,297,376.50 Worth of Alleged Preferential Transfers .............................. 5

            1.    The Objective Ordinary Course of Business Defense. ..................... 5

            2.    At A Minimum, $1,297,376.50 Worth of Alleged Preferential Transfers Fall Within Medline's Objective Ordinary Course of Business Defense. ............................................ 7

        B.    Medline's New Value Invoices Cover Any Remaining Preference Exposure. .................................................................................................. 9

        C.    Plaintiffs' Constructive Fraudulent Transfer Claim Fails Because Plaintiffs Received Reasonably Equivalent Value In Exchange For The Alleged Preferential Transfers. ........................................................ 10

        D.    Medline Is Entitled To Summary Judgment On Plaintiffs' Third And Fourth Claims For Relief. ....................................................................... 11

CONCLUSION .................................................................................................................... 11

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*In re AES Thames, LLC*,
  No. 11-10334 (KJC), 2016 WL 11595116 (Bankr. D. Del. Oct. 28, 2016) ..........................6, 7

*In re Am. Home Mortg. Holdings, Inc.*,
  476 B.R. 124 (Bankr. D. Del. 2012) ...................................................................................6

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...........................................................................................................5

*In re Carled, Inc.*,
  91 F.3d 811 (6th Cir. 1996) ............................................................................................6, 8

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...........................................................................................................4

*In re CL H Winddown LLC*,
  No. 21-10527 (JTD), 2023 WL 5740195 (Bankr. D. Del. Sept. 5, 2023) ........................10, 11

*Miller v. JNJ Logistics, LLC (In re Proliance Int'l, Inc.)*,
  514 B.R. 426 (Bankr. D. Del. 2014) ...............................................................................4, 10

*Miller v. Westfield Steel, Inc. (In re Elrod Holdings Corp.)*,
  426 B.R. 106 ......................................................................................................................5

*In re Parker Sch. Uniforms, LLC*,
  No. 18-10085 (CSS), 2021 WL 4553016 (Bankr. D. Del. Oct. 5, 2021) ...............................10

*In re Powerwave Techs., Inc.*,
  No. 13-10134 (MFW), 2017 WL 1373252 (Bankr. D. Del. Apr. 13, 2017) (Walrath, J.) 5, 7, 8

*In re Sierra Concrete Design, Inc.*,
  463 B.R. 302 (Bankr. D. Del. 2012) ....................................................................................9

*In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.*,
  9 F.3d 680 (8th Cir. 1993) ..............................................................................................6, 8

**STATUTES**

11 U.S.C. § 502(d) ..................................................................................................................5, 11

11 U.S.C. § 547 ............................................................................................................................2

11 U.S.C. § 547(c)(2)(B) ..........................................................................................................6, 8

11 U.S.C. § 547(c)(4) ...........................................................................................................9

11 U.S.C. § 548 ............................................................................................................10, 11

11 U.S.C. § 548(a)(1)(A) .....................................................................................................10

11 U.S.C. § 550 ..............................................................................................................5, 11

**RULES**

Federal Rule of Bankruptcy Procedure 7056 ..................................................................1, 4

Federal Rules of Civil Procedure Rule 56 ........................................................................1, 4

By Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding through Federal Rule of Bankruptcy Procedure 7056, Defendant Medline Industries, Inc. ("Medline") submits this brief in support of its motion for summary judgment on all claims asserted in Plaintiffs' June 25, 2021 complaint.

## PRELIMINARY STATEMENT

This motion for summary judgment is based on the following limited facts: (1) the nature of the parties' business relationship—*i.e.*, Medline sold, and Plaintiffs purchased, medical and hospital supplies; (2) Plaintiffs' data on the invoicing and payment relationship between the parties during the preference period; (3) Risk Management Association's data on the invoicing and payment practices in the relevant industry; (4) Medline's account aging data; and (5) Medline's data showing the amount of new value Medline provided to Plaintiffs.  The indisputable facts in those five categories show Medline is entitled to summary judgment on all of Plaintiffs' claims for at least four reasons:

*First*, a comparison of the invoicing and payment practices between Medline and Plaintiffs during the preference period with relevant industry data and Medline's practices across all customers reduces Plaintiffs' preference claims by $1,297,376.50, ***at a minimum***, after application of the objective ordinary course of business defense.

*Second*, under any scenario, Plaintiffs' remaining preference claims goes to $0 after accounting for Medline's new value.

*Third*, Plaintiffs' constructive fraudulent transfer claim fails because Plaintiffs' complaint admits, and the undisputed facts otherwise show, that the Alleged Preferential Transfers were made for reasonably equivalent value.

***Fourth***, Plaintiffs' remaining claims (claims three and four) depend on the success of Plaintiffs' preference and constructive fraudulent transfer claims—which fail—so Medline is entitled to summary judgment on those counts too.

## SUMMARY OF MATERIAL FACTS

Plaintiffs—Center City Healthcare, LLC d/b/a Hahnemann University Hospital ("CCH"), Philadelphia Academic Health System, LLC ("PAHS"), St. Christopher's Healthcare, LLC ("SCH"), and SCHC Pediatric Associates, LLC ("SCHC" and together with CCH, PAHS, and SCH, collectively, "Plaintiffs")—were owners and operators of hospitals in Philadelphia, Pennsylvania. (*See* Defendant's Statement of Undisputed Material Facts ("SUMF") ¶¶ 1-6.[2]) Defendant Medline supplied Plaintiffs with hospital and other medical supplies between, at a minimum, January 2018 through July 2019. (*Id*. ¶ 7.)

On June 30, 2019, CCH, PAHS, and SCH commenced their Chapter 11 bankruptcy cases captioned above. (*Id*. ¶ 8.) On July 1, 2019, SCHC commenced its Chapter 11 bankruptcy case. (*Id*. ¶ 9.) On June 25, 2021, Plaintiffs filed this adversary proceeding against Medline. (*Id*. ¶ 11.) The operative pleading seeks to recover 12 payments ("Alleged Preferential Transfers") under 11 U.S.C. § 547 that Plaintiffs made to Medline during the 90-day period preceding Plaintiffs' Chapter 11 petition dates ("Preference Period"). (*Id*. ¶¶ 12-34.) The payments were made in exchange for medical and hospital goods supplied by Medline. (*Id*. ¶¶ 11-36.)

The Alleged Preferential Transfers are as follows: (1) a wire dated April 10, 2019, with a wire number of FED#0410I1B7031R014111 in the amount of $400,000 dollars ("First Payment"); (2) a wire dated April 16, 2019, with a wire number of FED#0416I1B7033R010246 in the amount of $86,555 ("Second Payment"); (3) a wire dated April 19, 2019, with a wire number of

---

[2] Exhibits to the declarations of Michael A. Kaplan, Shane Reed, and Vincenzo Toppi filed in support of Medline's motion for summary judgment are referred to as "DX _."

FED#0419I1B7033R005971 in the amount of $150,000 ("Third Payment"); (4) a wire dated April 22, 2019, with a wire number of TRN#190422129809 in the amount of $349,011 ("Fourth Payment"); (5) a wire dated April 30, 2019, with a wire number of FED#0430I1B7033R022519 in the amount of $562,970 ("Fifth Payment"); (6) a check dated May 10, 2019, with a check number of 34156 in the amount of $532,636 ("Sixth Payment"); (7) a check dated May 15, 2019, with a check number of 34625 in the amount of $350,707 ("Seventh Payment"); (8) a check dated May 24, 2019, with a check number of 34909 in the amount of $462,232 ("Eighth Payment"); (9) a check dated May 30, 2019, with a check number of 35077 in the amount of $415,203 ("Ninth Payment"); (10) a check dated June 6, 2019, with a check number of 35318 in the amount of $467,759 ("Tenth Payment"); (11) a check dated June 12, 2019, with a check number of 35660, in the amount of $414,106 ("Eleventh Payment"); and (12) a wire dated June 27, 2019, with a wire number of FED#0627I1B7031R018220 in the amount of $201,846 ("Twelfth Payment"). (*See id*. ¶¶ 13-35.)

The range of days outstanding for invoices Medline issued to Plaintiffs for hospital and medical supplies decreased during the Preference Period. As a result, the invoicing patterns between Medline and Plaintiffs "moved toward industry standard" as the Preference Period went on. (*Id*. ¶ 61.)

Public data that Medline obtained from the Risk Management Association ("RMA") shows that the typical range of days outstanding in the "Medical, Dental, and Hospital Equipment and Supplies Merchant Wholesalers" industry—NAIC industry code 423450 ("Relevant Industry")—between February 2019 and August 31, 2019 period ("Industry Period"), for companies of Medline's size was 28 to 76 days ("RMA Industry Range"). (*Id*. ¶¶ 49-56.) All invoices that

Plaintiffs paid after March 22, 2019—or $1,297,376.50 worth—through the Alleged Preferential Transfers fall within the RMA Industry Range. (*Id.* ¶¶ 63-64.)

Medline also evaluated its invoicing and receivable practices across all customers during the Preference Period. (*Id.* ¶ 67.) That data shows that, as of May 2019, 13.85% of Medline's invoices to all customers were paid between 61 and 120 days with 92.32% of Medline's invoices to all customers paid between 0 to 120 days post invoice. (*Id.* ¶¶ 68-75.) When applying that 0 to 120 day window that more than 90% of Medline's customers fit within, all but $68,943.51 worth of the invoices paid by the Alleged Preferential Transfers were paid outside the window. (*Id.* ¶ 76.)

In addition, after each Alleged Preferential Transfer, Medline continued to provide goods to Plaintiffs. Those shipments of new goods are evidenced by invoices from Medline to Plaintiffs ("New Value Invoices") (*see* DX 8.)

## ARGUMENT

**I.    SUMMARY JUDGMENT STANDARD.**

Federal Rule of Civil Procedure 56 sets the summary judgment standard.[3] Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (explaining that the party moving for summary judgment has the initial burden of demonstrating the absence of a dispute of material fact). Once the movant presents sufficient proof in support of the motion, the burden shifts to the nonmoving party to show that "genuine issues of material fact still exist and that summary judgment is not

---

[3] Under Rule 7056 of the Federal Rules of Bankruptcy Procedure, Rule 56(c) of the Federal Rules of Civil Procedure applies to this adversary proceedings. Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56(c).

appropriate." *Miller v. JNJ Logistics, LLC (In re Proliance Int'l, Inc.)*, 514 B.R. 426, 429 (Bankr. D. Del. 2014). Mere allegations are not enough to establish a genuine issue of material fact. *Id*. There must be sufficient evidence on which a reasonable trier of fact could return a verdict for the nonmoving party. *Miller v. Westfield Steel, Inc. (In re Elrod Holdings Corp.)*, 426 B.R. 106, 109 (Bankr. D. Del. 2010; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–51 (1986).

## II. MEDLINE IS ENTITLED TO SUMMARY JUDGMENT ON ALL OF PLAINTIFFS' CLAIMS.

Medline is entitled to summary judgment on all of Plaintiffs' claims. Plaintiffs' $4,393,024.56 preference claim is reduced to, at most, $3,095,648.06 after application of the objective ordinary course defense. And once New Value Invoices are netted out from that figure, the amount remaining is reduced to $0. Plaintiffs' constructive fraudulent transfer claim similarly fails. Plaintiffs admit, and the undisputed facts otherwise show, that the Alleged Preferential Transfers were made for reasonably equivalent value. Finally, Medline is entitled to summary judgment on Plaintiffs' remaining claims under 11 U.S.C. § 550 and 11 U.S.C. § 502(d) because those claims depend on the success of Plaintiffs' preference and fraudulent transfer claims—which, as explained above and below, fail.

### A. Medline's Objective Ordinary Course Defense Covers $1,297,376.50 Worth of Alleged Preferential Transfers.

#### 1. The Objective Ordinary Course of Business Defense.

Section 547(c) of Chapter 5, Title 11 of the United States Code governs the preference claims asserted here. Among other defenses, Subsection 547(c)(2)(B) renders a transfer unavoidable to the extent it was: (1) "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee" and (2) "made according to *ordinary business terms*." (emphasis added). The phrase "ordinary business terms" means "the range of terms that encompasses the practices in which firms similar in some general way to the

creditor in question engage, and that only dealing so idiosyncratic as to fall outside the broad range should be deemed extraordinary and therefore outside the [exception]." *In re Powerwave Techs., Inc.*, No. 13-10134 (MFW), 2017 WL 1373252, at *8 (Bankr. D. Del. Apr. 13, 2017) (Walrath, J.). In other words, the defense applies when the transfer "comports with practices in the relevant industry." *Id*. This Court has said that the objective prong of the ordinary course defense "is ***not*** an exacting standard." *Id*. (emphasis added). Medline is entitled to "considerable latitude in defining what the relevant industry is" and "departures from that relevant industry's norms which are not so flagrant as to be 'unusual' remain within" the defense. *Id*. The evidentiary standard in proving the defense is "***not formidable***." *In re Am. Home Mortg. Holdings, Inc.*, 476 B.R. 124, 141 (Bankr. D. Del. 2012) (emphasis added).

"[T]he applicable industry standard is to be ascertained based on the credit arrangements of other debtors and creditors in a similar market." *In re AES Thames, LLC*, No. 11-10334 (KJC), 2016 WL 11595116, at *10 (Bankr. D. Del. Oct. 28, 2016). Data "from the Risk Management Association is [a] reliable" method to determine the industry standard. *Id*. at *9. For example, where the "number of days between invoice date and payment date" between the parties "fell within the payment range" of the applicable RMA data, Judge Carey concluded that the transfers between the parties fell "within ordinary business terms." *Id*. at *10.

A creditor can also meet its burden under the objective ordinary course defense through reference to its practices across all customers. For example, in *In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.*, 9 F.3d 680, 685 (8th Cir. 1993), the Eighth Circuit held that a creditor's evidence that "'probably eight to ten percent'" of the creditor's other customers "were on a similar [payment] schedule to [the debtor]" satisfied the creditor's burden in proving its defense under 11 U.S.C. § 547(c)(2)(B). Other courts have agreed. *See In re Carled, Inc.*, 91 F.3d 811, 818 (6th

Cir. 1996) (finding "[creditors] evidence show[ing] that ten percent of its commercial customers made payments thirty days or more after the meter reading date" sufficient to meet the objective ordinary course defense).

### 2. At A Minimum, $1,297,376.50 Worth of Alleged Preferential Transfers Fall Within Medline's Objective Ordinary Course of Business Defense.

The undisputed facts establish that, at a minimum, $1,297,376.50 of the Alleged Preferential Transfers were made within ordinary business terms. Medline has "considerable latitude in defining what the relevant industry is." *In re Powerwave Techs., Inc.*, 2017 WL 1373252, at *8. The evidence shows that the relevant industry is "Medical, Dental, and Hospital Equipment and Supplies Merchant Wholesalers" industry, which is NAIC industry code 423450. (SUMF ¶ 54.) Plaintiffs do not dispute this is the relevant industry. (*Id*. ¶ 55.) RMA data gathered for that industry shows the RMA Industry Range for days invoices remained outstanding was 28 to 76 days.[4] (*Id*. ¶ 57.) $1,297,376.50 of the Alleged Preferential Transfers fall within that range, (*id*. ¶¶ 58-64; DX 7 at 104), and therefore fall within "ordinary business terms." *In re AES Thames, LLC*, 2016 WL 11595116, at *10.

Plaintiffs' rebuttal expert witnesses' analysis supports this conclusion. Plaintiffs' expert agreed that, as the Preference Period went on, the days outstanding for invoices between Medline and Plaintiffs "moved towards industry standard." (SUMF ¶ 62, DX 3 at Dep. Tr. 114:16-116:22.) According to Plaintiffs' experts' report: "all the invoices dated after [March 22, 2019]" were paid within the Industry Range and the transactions between the parties "moved toward industry

---

[4] This is a ***conservative*** range. As discussed in Mr. Toppi's declaration filed with this motion, the RMA data collected by Medline included data that extended until December 2019, several months beyond the Industry Period. (*See* Exhibit 4 to the November 17, 2023 Declaration of Shane Reed.) That longer period captured data from 46 companies. Had the information for this extended period been included, the Industry Range would have expanded to 27 to 110 days, capturing many more invoices paid by the Alleged Preferential Transfers within Medline's objective ordinary course defense.

standard during the preference period." (*Id*. at ¶ 62, DX 2 at 4.) In sum, there is no dispute that $1,297,376.50 of the Alleged Preferential Transfers were made according to ordinary business terms and are not avoidable under 11 U.S.C. § 547(c)(2)(B).

Medline's payment and invoicing practices across all customers supports an even larger objective ordinary course defense. *See In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.*, 9 F.3d at 685; *see also In re Carled, Inc.*, 91 F.3d at 818. During the preference period, Medline's customers paid 13.85% of all Medline invoices between 61 and 120 days. 92.32% of Medline's invoices were paid between 0 and 120 days. (SUMF ¶¶ 68-76; *see also* Reed Decl. ¶ 15.) This is a much greater percentage than the "eight to ten percent" of customers the Eight Circuit found sufficient to establish the industry standard in *In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.*, 9 F.3d at 685. *See also In re Carled, Inc.*, 91 F.3d at 818. When the Industry Range is expanded to include Medline's practices with all customers—invoices paid between 0 and 120 days—only $68,943.51 worth of Alleged Preferential Transfers fall outside ordinary business terms. (SUMF ¶ 76.)

In sum, the parties' conduct during the Preference Period was "not so flagrant as to be 'unusual.'" *In re Powerwave Techs., Inc.*, 2017 WL 1373252, at *8. The undisputable data included with Medline's summary judgment motion warrants a near complete defense judgment on the objective ordinary course of business defense. Consideration of Medline's practices across all customers reduces its preference exposure to only $68,943.51. Even using the more conservative analysis based on RMA data, Medline's preference exposure is reduced to $3,095,648.06. Neither amount is sufficient to survive Medline's new value defense, discussed below.

B.   **Medline's New Value Invoices Cover Any Remaining Preference Exposure.**

Even if some of the Alleged Preferential Transfers are not protected from avoidance under Medline's objective ordinary course defense, the new value Medline provided during the Preference Period still reduces Plaintiffs' preference claims to $0.

The "new value" defense under 11 U.S.C. § 547(c)(4) reduces a creditor's preference exposure to the "net result of the preferential transfers and subsequent new value (paid and unpaid)." *In re Proliance Int'l, Inc.*, 514 B.R. 426, 438 (Bankr. D. Del. 2014). New value means "money or money's worth in goods, services, or new credit . . . that is neither void nor voidable by the debtor or the trustee under any applicable law." *Id*. at 431. To prove its new value defense, Medline was only required to "track the debits and credits generally" to identify the "net result." *In re Sierra Concrete Design, Inc.*, 463 B.R. 302, 307 (Bankr. D. Del. 2012). Although Medline was not required to "link specific invoices to specific payments," *id*., Medline has provided such an analysis in support of its motion. *See* DX 7 at 104; *see also* DX 5 at 104.

Here, $3,095,648.06 in Alleged Preferential Transfers fall outside the more-conservative RMA Industry Range ("Other Invoices"). As for the invoices paid by those transfers, Medline prepared an analysis, attached as DX 7, that subtracted—on an invoice-by-invoice basis in sequential order—New Value Invoices from the Other Invoices. (SUMF ¶ 66, DX 7 at 104.) The "net result" of this analysis is $0.[5] Thus, Medline is entitled to summary judgment on Plaintiffs' preference claims. *See In re Sierra Concrete Design, Inc.*, 463 B.R. at 308 (granting summary judgment on new value defense based on analysis similar to that provided in Medline's DX 7); *see also In re Proliance Int'l, Inc.*, 514 B.R. at 438.

---

[5] Of course, Medline's New Value Invoices are more than sufficient to cover the $68,943.51 in exposure remaining when the industry range is expanded to include Medline's practices with all customers—invoices paid between 0 and 120 days. *See* DX 5 at 104.

C. **Plaintiffs' Constructive Fraudulent Transfer Claim Fails Because Plaintiffs Received Reasonably Equivalent Value For The Alleged Preferential Transfers.**

Plaintiffs' second claim for relief alleges a cause of action for constructive fraudulent transfer under 11 U.S.C. § 548. (DX 1 at ¶¶ 46-48.)[6] This claim requires Plaintiffs to establish:

> (i) The [Alleged Preferential Transfers] were made within two years of the petition date;
>
> (ii) The debtor received less than reasonably equivalent value in exchange of the [Alleged Preferential Transfers]; and
>
> (iii) The debtor either (a) was insolvent on the date the [Alleged Preferential Transfers] were made or became insolvent as a result of the transfers; or (b) was about to engage in business or a transaction for which any property remaining with the debtor was an unreasonably small capital; (c) intended to incur or believed that it would incur debts beyond the debtor's ability to pay; or (d) the debtor made the [Alleged Preferential Transfers] or incurred the obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

*In re CL H Winddown LLC*, No. 21-10527 (JTD), 2023 WL 5740195, at *3 (Bankr. D. Del. Sept. 5, 2023) (quoting 11 U.S.C. § 548.)

Plaintiffs' 11 U.S.C. § 548 constructive fraudulent transfer claim fails at the second necessary element—*i.e.*, lack of reasonably equivalent value. "[I]t is well-settled that a 'transfer made in satisfaction of an antecedent debt or for an obligation for which the debtor was liable presumptively constitutes reasonably equivalent value.'" *In re Parker Sch. Uniforms, LLC*, No. 18-10085 (CSS), 2021 WL 4553016, at *7 (Bankr. D. Del. Oct. 5, 2021). Here, there is no dispute that the Alleged Preferential Transfers were made to satisfy antecedent debts Plaintiffs incurred through their purchase of medical and hospital supplies from Medline. (SUMF ¶ 7.) Plaintiffs'

---

[6] Plaintiffs do not allege that they made the Alleged Preferential Transfers with the "actual intent to hinder, delay, or defraud . . . ." (*Compare* DX 1 at 8 ¶¶ 46-48 *with* 11 U.S.C. § 548(a)(1)(A).)

complaint acknowledges this. Plaintiffs allege "*all* of" the alleged Preferential Transfers "were on account of *antecedent obligations*." (DX 1 at ¶ 32 (emphasis added); *see also id*. at ¶ 41); *see also In re CL H Winddown LLC*, 2023 WL 5740195, at *3 (dismissing 11 U.S.C. § 548 claim with prejudice.) The Court should grant Medline summary judgment on Plaintiffs' constructive fraudulent transfer claim.

### D. Medline Is Entitled To Summary Judgment On Plaintiffs' Third And Fourth Claims For Relief.

Plaintiffs' complaint also contains claims seeking the "recovery of property" and the "disallowance of all claims" under 11 U.S.C. § 550 and 11 U.S.C. § 502(d), respectively. But those claims "are both dependent on the success of the preference and fraudulent transfer claims." *In re CL H Winddown LLC*, 2023 WL 5740195, at *3 (dismissing 11 U.S.C. § 502(d) and § 550 claims with prejudice.) As shown above, Plaintiffs' preference and fraudulent transfer claims fail. Thus, Plaintiffs' 11 U.S.C. § 502(d) and § 550 claims fail with them. *Id*.

Medline is entitled to summary judgment on Plaintiffs' 11 U.S.C. § 502(d) claim for another reason. That claim asks the Court to "disallow" any claim Medline filed in connection with the above-captioned Chapter 11 cases. (*See* DX 1 ¶¶ 52-55; *see* 11 U.S.C. § 502(d); *see also id*. § 502(j) (permitting reconsideration of a previously allowed claim)). But Medline has no claim (allowed, disallowed, or otherwise) in connection with the above-captioned bankruptcy. (SUMF ¶ 10.) Accordingly, Plaintiffs' claim is moot and Medline is entitled to summary judgment on Plaintiffs' 11 U.S.C. § 502(d) claim for that extra reason.

### CONCLUSION

For all these reasons Medline is entitled to summary judgment on the claims asserted in Plaintiffs' June 25, 2021 complaint.

Dated: Wilmington, Delaware
November 17, 2023

**THE ROSNER LAW GROUP LLC**

By: */s/ Zhao Liu*
    Frederick B. Rosner (DE 3995)
    Zhao (Ruby) Liu (DE 6436)
    824 Market Street, Suite 810
    Wilmington, DE 19801
    Tel.: (302) 777-1111
    Email: rosner@teamrosner.com
           liu@teamrosner.com

-and-

**LOWENSTEIN SANDLER LLP**

By: */s/ Robert M. Hirsh*
    Robert M. Hirsh, Esq.
    Bruce S. Nathan, Esq.
    Phillip Khezri, Esq.
    1251 Avenue of the Americas
    17th Floor
    New York, New York 10020
    Telephone: (212) 262-6700
    Facsimile: (212) 262-7402
    Email:   rhirsh@lowenstein.com
               bnathan@lowenstein.com
               pkhezri@lowenstein.com

-and-

    Michael A. Kaplan, Esq.
    C. Patrick Thomas, Esq.
    One Lowenstein Drive
    Roseland, New Jersey 07068
    Telephone: (973) 597-2500
    Facsimile: (973) 597-2400
    Email:   mkaplan@lowenstein.com

*Attorneys for Defendant*