**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Ch. 11 |
| | ) | |
| CENTER CITY HEALTHCARE, LLC | ) | Case No. 19-11466 (MFW) |
| d/b/a HAHNEMANN UNIVERSITY | ) | |
| HOSPITAL, | ) | |
| et al. | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| CENTER CITY HEALTHCARE, LLC, | ) | |
| d/b/a HAHNEMANN UNIVERSITY | ) | |
| HOSPITAL, PHILADELPHA ACADEMIC | ) | Adv. Proc. No. 21-50920 (MFW) |
| HEALTH SYSTEM, LLC, ST. | ) | |
| CHRISTOPHER'S HEALTHCARE, LLC | ) | Rel Docs: 1, 61, 62, 63, 71, |
| And SCHC PEDIATRIC ASSOCIATES, | ) | 72, 76 |
| LLC, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MEDLINE INDUSTRIES, INC., | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**MEMORANDUM OPINION[1]**

Before the Court is the Motion for Summary Judgment filed by
the Defendant Medline Industries, Inc. (the "Defendant") on the
Complaint filed by the Debtors[2] to recover alleged avoidable
preferences and fraudulent conveyances.  For the reasons stated
below, the Court will grant the Motion.

---

[1]   This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Rule 7052.

[2]   The Debtors are Center City Healthcare, LLC d/b/a Hahnemann
University Hospital, Philadelphia Academic Health System, LLC,
St. Christopher's Healthcare LLC, and SCHC Pediatric Associates,
LLC.

I.    <u>BACKGROUND</u>

The Debtors filed their respective chapter 11 cases in June and July, 2019.[3]  At the time, the Debtors operated two major hospitals in Philadelphia: St. Christopher's Hospital for Children and Hahnemann University Hospital, as well as several affiliated physician practice groups.[4]

Prior to the Petition Date, one or more of the Debtors made certain transfers to the Defendant for goods and/or services provided to them, pursuant to invoices or statements submitted by the Defendant.  Post-petition, the Debtors filed a complaint seeking to avoid and recover transfers made to the Defendant during the period April 1 through June 30, 2019 (the "Preference Period") pursuant to sections 547, 548 and 550 of the Bankruptcy Code.[5]  The Defendant filed a Motion for Summary Judgment on November 17, 2023.[6]  The Debtors filed their response on December 12, 2023.[7]  The Defendant filed its reply on December 29, 2023.[8]  The matter is ripe for decision.

---

[3]    D.I. 1.  References to the docket in the main case are to "D.I. #," while references to the docket in this adversary proceeding are to "Adv. D.I. #."

[4]    D.I. 3.

[5]    Adv. D.I. 1.

[6]    Adv. D.I. at 61.

[7]    Adv. D.I. at 71.

[8]    Adv. D.I. at 76.

II.  <u>JURISDICTION</u>

This adversary proceeding is a core proceeding over which the Court has subject-matter jurisdiction.[9]  Additionally, the parties have consented to the entry of a final order on the Motion for Summary Judgment by this Court.[10]

III. <u>DISCUSSION</u>

A.  <u>Standard of Review</u>

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[11] The court must make its determination based upon the record of

---

[9]    28 U.S.C. §§ 157(b)(2)(A), (B), (F) & (H), & 28 U.S.C. 1334(a).

[10]    Adv. D.I. 1 at ¶ 18 & Adv. D.I. 61-1.  Although the Defendant did initially object to this Court's ability to enter a final order, it has now asked the Court to enter a final judgment against the Debtors on its Motion for Summary Judgment.  Adv. D.I. 17 at ¶ 18 & Adv. D.I. 61-1.  <u>See, e.g.</u>, <u>Wellness Int'l Network, Ltd. v. Sharif</u>, 575 U.S. 665, 683-84 (2015) (holding that the bankruptcy court may enter a final order without offending Article III so long as the parties consent).  <u>See also</u> Del. Bankr. L.R. 9013-1(f) & (h) (requiring that all motions and objections "shall contain a statement that the [filing party] does or does not consent to the entry of final orders" and that in the absence of such a statement, the party "shall have waived the right to contest the authority of the Court to entire final orders or judgments.").

[11]    Fed. R. Civ. P. 56(a), made applicable by Fed R. Bankr. P. 7056.

the case presented by the parties, including the pleadings, exhibits, and the products of discovery.[12]

The movant bears the initial burden of proving that it is entitled to relief and that there is no genuine dispute of material fact,[13] with the court viewing the record in the light most favorable to the non-moving party.[14]  A fact is material when, under applicable substantive law, it "might affect the outcome of the suit."[15]  A dispute over a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[16]

When the movant has met its burden, the non-moving party must show more than "some metaphysical doubt as to the material facts."[17]  Where a court ultimately finds that there is no genuine dispute of material fact, it may enter judgment as a matter of law, either for or against the movant, in full or in part, applying the applicable substantive law.[18]

_____

[12]   Fed. R. Civ. P. 56(c).

[13]   Celotex Corp. v. Cartrett, 477 U.S. 317, 323 (1986).

[14]   United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

[15]   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[16]   Id.

[17]   Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

[18]   Fed. R. Civ. P. 56(a) & (f).

B.    <u>Preferences</u>

Count One of the Complaint seeks the avoidance and recovery of transfers made by the Debtors to the Defendant during the preference period totaling $4,393,024.56 as preferential transfers pursuant to section 547 of the Bankruptcy Code.

The Defendant asserts two bases for summary judgment in its favor on the Debtors' preference claims: (1) it argues that its preference liability is reduced by $1,297,376.50 under the objective ordinary course of business defense of section 547(c)(2)(B); and (2) it asserts that the remaining liability of $3,095,648.06 is eliminated by the subsequent new value defense of section 547(c)(4).[19]

1.    <u>Objective Ordinary Course of Business Defense</u>

The Defendant asserts that, even if the transfers were preferential, a portion of them are exempt from avoidance under the ordinary course of business defense contained in section 547(c)(2), which provides:

> (c)  The [debtor] may not avoid under this section a transfer –
>
>               . . .
>
> (2)  to the extent that such transfer was in <u>payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the</u>

---

[19]    The Defendant does not dispute the amount of the transfers that occurred during the preference period nor contest that the Debtors were insolvent during that period.  Adv. D.I. 63 at ¶¶ 13-36, 64-65.  The Code presumes that the Debtors were insolvent during the preference period.  11 U.S.C. § 547(f).

> transferee, and such transfer was
> (A)   made in the ordinary course of
>        business or financial affairs of
>        the debtor and the transferee; or
> (B)   made according to ordinary business
>        terms.[20]

The Defendant relies on subsection (B) which is called the "objective" ordinary course of business test because it evaluates the alleged preferential transfers in light of the general practice in the industry (as opposed to the subjective test of subsection (A) which evaluates the transfers in light of the practice between the debtor and the transferee).[21]  The Defendant contends that $1,297,376.50 of the payments made by the Debtors to it were made according to the ordinary business terms of companies in its industry and thus are not avoidable.

In support, the Defendant submitted the Declaration of an expert, Vincenzo Toppi, who compared the range of days it took for the Debtors to pay the Defendant's invoices against the range for payments by companies in the same industry and of the same size as the Defendant.[22]  To determine the "days to pay" the Defendant's invoices, Mr. Toppi reviewed the Defendant's

---

[20]   11 U.S.C. § 547(c)(2) (emphasis added).

[21]   In re Molded Acoustical Prods., Inc., 18 F.3d 217, 224 (3d Cir. 1994) (finding that in determining the ordinary course of business in the industry, the court "must focus beyond solely what is normal between the debtor and creditor.").

[22]   Adv. D.I. 66 at ¶ 2.

records.[23]  To determine the "days to pay" of comparable
companies in the industry, Mr. Toppi relied on data compiled by
Risk Management Association ("RMA").[24]  From the RMA data, Mr.
Toppi concluded that the range of days to pay for invoices of the
13 Companies in the RMA data set during the Preference Period was
28 to 76 days.[25]  Mr. Toppi concluded that $1,297,376.50 worth of
the Defendant's invoices paid by the alleged preferential
transfers fall within that range.[26]

> a.   Admissibility of RMA Data

The Debtors object to the admissibility of the RMA data as
hearsay.  The Debtors argue that the RMA data/report is an out of
court statement relying on other out of court statements (i.e.,
data submitted by companies to RMA) which is offered for the
truth of the matter asserted.  They contend that is hearsay
within hearsay which is inadmissible.[27]

---

[23]   Id. at ¶ 5 & Ex. 6.

[24]   Id. at ¶ 18 & Ex. 7.  The Defendant also presented the
Declaration of its Director of Credit, Shane Reed, who stated
that he and other professionals in the industry rely on the data
compiled by RMA in making credit decisions.  Adv. D.I. 65 at ¶ 7
& Ex. 4.

[25]   Id.

[26]   Id. at ¶ 20 & Ex. 7.

[27]   See Fed. R. Evid. 801(c):
"Hearsay" means a statement that:
(1) the declarant does not make while testifying at the
current trial or hearing; and
(2) a party offers in evidence to prove the truth of

In support, the Debtors cite the <u>Hechinger</u> case where certain "days to pay" business records of other companies' on which an expert relied to show the industry standard were found to be inadmissible hearsay because they lacked a proper foundation.[28]  They argue that the same analysis applies here because the RMA data on which Mr. Toppi relied was simply raw data that RMA had obtained from various companies in the industry.[29]  The Debtors argue that, while experts may rely on hearsay in formulating an opinion, the Defendant's expert did not do that here.  Instead, the Debtors contend that the Defendant's expert did no analysis of the data and is doing nothing more than seeking to "smuggle in" the inadmissible RMA data wholesale which they contend is insufficient to establish a defense.[30]

---

the matter asserted in the statement.

[28]  <u>Hechinger Liquidation Tr. v. Robert Lee Rager (In re Hechinger Investment Co. of Del., Inc.)</u>, 298 B.R. 240, 242 (Bankr. D. Del. 2003) (finding that information solicited from other businesses in the industry and submitted with summary judgment motion to demonstrate general industry business terms "contain[ed] statements that are offered for the truth of the matter therein and are therefore inadmissible hearsay").

[29]  <u>Cf.</u> Fed. R. Evid. 802 & 803.

[30]  <u>See, e.g.</u>, <u>United States v. Tomasian</u>, 784 F.2d 782, 786 (7th Cir. 1986) ("Rule 703 does not sanction the simple transmission of hearsay; it only permits an expert opinion based on hearsay."); <u>Crowley v. Chait</u>, 322 F. Supp. 2d 530, 553 (D.N.J. 2004) (noting that "an expert may not be used simply as a vehicle for the admission of otherwise inadmissible hearsay testimony"); <u>Stanziale v. S. Steel Supply, L.L.C. (In re Conex Holdings, LLC)</u>, 518 B.R. 269, 285 (Bankr. D. Del. 2014) ("While expert testimony is not necessarily required, a defendant must provide admissible,

In reply, the Defendant argues that the RMA data itself is admissible under Rule 803(17) which provides an exception to the hearsay rules for "Market Reports and Similar Commercial Publications."[31]  The Defendant argues that the data in question was, in fact, compiled by RMA from companies in the industry and, therefore, is admissible.  Further, the Defendant notes that numerous courts have admitted expert testimony which relied on the same RMA data.[32]

The Court agrees with the Defendant that the RMA data is admissible under the hearsay exception of Rule 803(17).  That Rule provides an exception to the hearsay rule for "Market quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations."[33]  The RMA data is a compilation of the "days to pay" data garnered from information provided to RMA from companies in the industry.  Further, the declaration of Shane Reed, the Defendant's Director of Credit, confirms that the RMA data is routinely used by him and others in the industry to

---

non-hearsay testimony related to industry credit, payment, and general business terms in order to support its position.").

[31]    Fed. R. Evid. 803(17).

[32]    See, e.g., Forman v. P&M Brick LLC (In re AES Thames, LLC), No. 13-50406 (KJC), 2016 WL 11595116, at *8-9 (Bankr. D. Del. Oct. 28, 2016) and cases cited therein.

[33]    Fed. R. Evid. 803(17).

determine credit terms.[34]  Finally, courts have routinely admitted testimony from experts who relied on RMA data in determining the ordinary repayment terms in various industries.[35]

The case on which the Debtors rely is distinguishable.  The Court in <u>Hechinger</u> did not exclude RMA data as hearsay.[36] Instead, the Court excluded information that the defendant's attorney had solicited directly from other companies in the industry, concluding that there was no foundation sufficient to qualify those statements under the business records exception to the hearsay rules.[37]

Therefore, the Court concludes that the RMA data is admissible under Rule 803(17) of the Federal Rules of Evidence.

b.  <u>Reliability of Expert Methodology</u>

The Debtors also argue that the methodology used by the

---

[34]   Adv. D.I. 65 at ¶¶ 4-11.

[35]   <u>See, e.g.</u>, <u>Dietz v. Jacobs</u>, Civ. No. 12-1628, 2014 WL 1153502, at *4 (D. Minn. Mar. 21, 2014) (concluding that expert's reliance on RMA data was permissible and noting that "experts have used RMA data in other cases and contexts without the mere fact of that use rendering the expert testimony inadmissible") (citations omitted); <u>Caruso v. John Wiley & Sons, Inc. (In re ITT Educ. Servs., Inc.)</u>, No. 16-07207-JMC-7A, 2021 WL 933984, at *9 (Bankr. S.D. Ind. Mar. 11, 2021) (concluding that "reliance on data obtained from RMA is both reasonable and appropriate for determining the relevant industry standards"); <u>AES Thames</u>, 2016 WL 11595116, at *9 ("[O]ther courts have admitted RMA data, which is sufficient evidence that it is generally accepted.").

[36]   <u>Hechinger</u>, 298 B.R. at 242.

[37]   <u>Id.</u>  <u>See</u> Fed. R. Evid. 803(6).

Defendant's expert is unreliable.  They contend that Rule 702 of the Federal Rules of Evidence requires that the proponent of expert testimony demonstrate that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[38]

The Debtors assert that the Defendant's expert did not actually determine what the appropriate industry was or determine what the range of "days to pay" was in that industry.  Instead, they contend that it was the Defendant's attorneys who determined what the applicable industry was and who requested that industry's raw data of "days to pay" from RMA.  They further assert that neither RMA nor the Defendant's expert performed any analysis of that data but simply used it "as is."[39]  In fact, the Debtors note that the RMA itself warns that its data is not unconditionally reliable.[40]  The Debtors argue that the only task

---

[38]   Fed. R. Evid. 702.

[39]   Adv. D.I. 74 at ¶ 9; Adv. D.I. 66 at ¶ 3; Adv. D.I. 65 at ¶ 6.

[40]   See Adv. D.I. 75 at Ex. 80 (RMA Annual Statement Studies states that its information should be used "only as general guidelines and not as absolute industry norms").

Mr. Toppi performed was to identify the payments made by the Debtors to the Defendant that fell within that industry range. Thus, the Debtors argue that Mr. Toppi did not provide expert testimony sufficient to establish the objective ordinary course of business defense.

The Debtors contrast this with how the expert used RMA data in the AES Thames case. In that case, the expert obtained data from three different industries for more than 400 companies (in comparison to the single industry and 13 companies used by Mr. Toppi in this case). More importantly, the Debtors argue, the expert in AES Thames created an average statistical range which included only the middle 50% of the data points, thereby excluding outliers. The Debtors contend that Mr. Toppi performed no such analysis. Had he done so, the Debtors assert that he would have concluded that the applicable industry range is 28 to 55 days and that none of the alleged preferential transfers would have qualified as being in the objective ordinary course of business.[41]

The Defendant responds that the AES Thames Court rejected the Debtors' exact argument.[42] Further, the Defendant notes that the AES Thames Court did not state that an expert had to analyze

---

[41]    Adv. D.I. 74 at ¶ 15.

[42]    AES Thames, 2016 WL 11595116, at *8-9 (rejecting trustee's effort to exclude expert's reports as unreliable because the expert relied exclusively on RMA data).

several different industries' data, had to rely on hundreds of different data points, had to exclude outliers, or had to limit the data set on which it relied.  Instead, the Defendant contends that the Court in <u>AES Thames</u> held unequivocally that an expert was entitled to rely on RMA data to establish an industry's normal credit terms.[43]

The Court agrees with the Defendant that the expert methodology used by Mr. Toppi is sufficiently reliable to demonstrate the industry standard.  The Third Circuit has held that the standard for determining ordinary business terms "though still requiring that the creditors make some showing of an industry standard, is quite accommodating."[44]  The Court stated that the objective test

> does not imply that the creditor must prove the existence of some single, uniform set of industry-wide credit terms, a formidable if not insurmountable obstacle given the great variances in billing practices likely to exist within the set of markets or submarkets which one could plausibly argue comprise the relevant industry. . . . [Instead,] "'ordinary business terms' refers to the <u>range</u> of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage. . . ."[45]

That accommodating and flexible approach to establishing an industry standard for ordinary business terms warrants acceptance

---

[43]    <u>Id.</u> at *9.

[44]    <u>Molded Acoustical</u>, 18 F.3d at 224.

[45]    <u>Id.</u> (quoting <u>In re Tolona Pizza Prods. Corp.</u>, 3 F.3d 1029, 1033 (7th Cir. 1993).

of Mr. Toppi's conclusions that the RMA data is sufficient to establish the industry range of "days to pay" without further analysis.  This is particularly appropriate here because the Debtors have not rebutted any of the Defendant's evidence on this point.

While hinting that Mr. Toppi's conclusions were unreliable because he simply accepted the industry designation identified by Defendant's counsel, the Debtors' own expert (William Pederson) testified that he found nothing wrong with using that category.[46] The Court agrees that, in this case, the RMA industry category used by Mr. Toppi ("Medical, Dental, and Hospital Equipment and Supplies Merchant Wholesalers") clearly describes the Defendant's industry.[47]  In contrast, the expert in AES Thames used three different industry categories because there was not one industry category in the RMA data directly applicable to it.[48]

In addition, Mr. Pederson asserted that the number of comparable companies used by Mr. Toppi was small (13) and some of the companies' data in the RMA data set did not cover the preference period.[49]  Mr. Toppi stated, however, that if the data was expanded to include the preference period, the number of

---

[46]    Adv. D.I. 64-3 at 113:10-114:2.

[47]    Adv. D.I. 65 at ¶ 11; Adv. D.I. 66 at ¶¶ 2-3.

[48]    AES Thames, 2016 WL 11595116, at *6-7.

[49]    Adv. D.I. 74 at ¶ 13.

companies included would have increased to 46 and the range would have expanded to 27-110 days thereby excluding even more of the alleged preference payments.[50]

The Court concludes that the rebuttal evidence presented by the Debtors is insufficient to establish any genuine issue of material fact regarding the reliability of Mr. Toppi's testimony.[51]

### c.   Extraordinary Collection Efforts

The Debtors further argue that the practices which encompass "ordinary business terms" which the Court must evaluate encompass a "range of terms" rather than the singular "days to pay" term on which the Defendant relies.[52]  They contend that the Court must also consider the parties' relationship and behavior during and after the preference period to determine if it was in the

---

[50]    Adv. D.I. 66 at n.3.

[51]    The Defendant also offered evidence that the days to pay invoices made by the Debtors to it were consistent with the payment terms of other customers of the Defendant.  See Adv. D.I. 65 at ¶¶ 14-16.  The Debtors contend that such evidence is not relevant to a determination of ordinary business terms in the industry and is not admissible because the Defendant did not produce that evidence in discovery.  Because the Court does not rely on that evidence, it is unnecessary to address this issue.

[52]    Molded Acoustical, 18 F.3d at 224 (holding that the ordinary course of business exception includes "the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage") (citation omitted) (emphasis added).

ordinary course of business.[53]  They argue that an objective ordinary course of business defense should be rejected where collection efforts are so extreme or unusual as to offend the principles underlying the preference statute.

The Debtors argue specifically that the Defendant and its expert ignore the fact that the Debtors and Defendant never had "ordinary course of business" dealings.  They contend that, following the Debtors' purchase of the Hospitals in 2018, the Defendant did not establish new accounts or credit terms for many months and imposed onerous terms on them because of concerns it had about the Debtors' financial condition.[54]  The Debtors assert that the Defendant's collection efforts during the preference period were extraordinary and, therefore, fall outside of what

---

[53]    See, e.g., Burtch v. Prudential Real Estate & Relocation Servs., Inc. (In re AE Liquidation, Inc.), 729 F. App'x 153, 158 (3d Cir. 2018) ("In other words, the Bankruptcy Court did not consider the faster payment rate in isolation.  Rather, it considered the nineteen day difference in the context of the parties' relationship, similarity of transactions, the manner in which payment was tendered, Prudential's new and unusual collection efforts during the Preference Period, and Prudential's actions after learning of Eclipse's financial hardship.  We agree with the Bankruptcy Court's analysis that, taken as a whole, Prudential's conduct in the Preference Period deviated from the parties' ordinary course of business practices."); FBI Wind Down Inc. Liquidating Tr. v. All Am. Poly Corp. (In re FBI Wind Down, Inc.), 581 B.R. 116, 143-44 (Bankr. D. Del. 2018) (finding that transfers made pursuant to unusual collection activity can defeat an ordinary course of business defense but denying plaintiff's motion for summary judgment because there was a dispute of material facts).

[54]    Adv. D.I. 75 at Ex. 5 § 3.5, Ex. 6 ¶¶ 5-9 & 18, Exs. 14-17, 28, 36, 41, 51.

should be considered ordinary business terms.

In reply, the Defendant asserts that the Debtors have provided no expert to establish that the Defendant's collection efforts were outside of the ordinary course of business in the industry.  The Defendant contends that, on the contrary, there was nothing extraordinary about it consistently enforcing the Debtors' credit limit both before and during the Preference Period.[55]  In addition, the Defendant argues that its collection efforts are not relevant to the objective ordinary course of business defense.  The Defendant argues that the Debtors are inappropriately merging the objective and subjective prongs of the analysis.

The Court agrees with the Defendant that any evidence of the Defendant's collection activity, even if extraordinary or unusual, is not relevant to the objective ordinary course of business defense.  The Debtors' reliance on the <u>Molded Acoustical</u> case is misplaced.  That case was decided prior to the 2005 amendments to section 547(c), at a time when a defendant had to prove that its relationship with the debtor satisfied <u>both</u> the

---

[55]   <u>See</u> <u>Burtch v. Detroit Forming, Inc. (In re Archway Cookies, Inc.)</u>, 435 B.R. 234, 244-45 (Bankr. D. Del. 2010) (concluding that transfers were made in the ordinary course of business between the parties under section 547(c)(2)(A) because although the tactics of which the plaintiff complained "appear to be the practices that § 547 was created to solve, the Court finds that these practices were consistent with the historical dealings between the Debtors and the Defendant").

subjective and the objective tests.[56]  The other cases on which the Debtors rely are also inapplicable because they deal with the subjective test, not the objective test.[57]  The Debtors provide no authority for the proposition that bankruptcy policy demands that the Court import the subjective analysis into the objective one.  Further, that argument is contra to the express language of the statute which provides a defense if the Defendant can show that the parties acted <u>either</u> in the ordinary course of their own business dealings <u>or</u> in the ordinary course of business dealings in the industry.[58]

The Court finds that the Defendant presented admissible, reliable, and sufficient evidence to establish that $1,297,376.50 of the alleged preferential transfers made by the Debtors to the Defendant were made according to ordinary business terms in the industry.  Consequently, the Court will grant the Defendant's Motion for Summary Judgment on Count One as to those transfers.

    2.  <u>New Value</u>

The Defendant also argues that the remaining amount of $3,095,648.06 of the alleged preferential transfers are exempt

---

[56]  <u>Molded Acoustical</u>, 18 F.3d at 219 (citing 1993 version of section 547(c)(2)).  <u>See</u> H.R. Rep. No. 31, 109th Cong., 1st Sess. 409 (2005).

[57]  <u>See</u> <u>AE Liquidation</u>, 729 F. App'x at 157; <u>FBI Wind Down</u>, 581 B.R. at 139.

[58]  11 U.S.C. § 547(c)(2).

from avoidance under section 547(c)(4)[59] because it provided
subsequent new value to the Debtors.[60]   The Defendant's expert,
Mr. Toppi, provided an analysis where he deducted the amounts of
subsequent invoices reflecting new shipments of goods to the
Debtors from the alleged preferential transfers which were not
found exempt under the ordinary course of business; this
eliminated all of the alleged preferential transfers.[61]

The Debtors contend that, because the Defendant's ordinary
course of business defense does not shield any of the
preferential payments, its new value defense fails to shield all
payments from avoidance.   They also contend that the new value

---

[59]    Section 547(c)(4) provides that:
    (c) The [debtor] may not avoid under this section a
    transfer —
                        . . .
    (4) to or for the benefit of a creditor, to the extent
    that, after such transfer, such creditor gave new value
    to or for the benefit of the debtor —
        (A) not secured by an otherwise unavoidable
        security interest; and
        (B) on account of which <u>new value the debtor
        did not make an otherwise unavoidable
        transfer</u> to or for the benefit of such
        creditor.
11 U.S.C. § 547(c)(4) (emphasis added).

[60]    For purposes of section 547, new value is defined as "money
or money's worth in goods, services, or new credit, or release by
a transferee of property previously transferred to such
transferee in a transaction that is neither void nor voidable by
the debtor or the trustee under any applicable law, including
proceeds of such property, but does not include an obligation
substituted for an existing obligation."  11 U.S.C. § 547(a)(2).

[61]    Adv. D.I. 66 at Exs. 7 & 8.

analysis prepared for the Defendant by Mr. Toppi contains several errors.[62]  In support, they rely on a declaration of Susannah Prill, a CPA, who asserts that Mr. Toppi counted new value invoices (totaling $539,523.93) from before the preference period and after the petition date, which she asserts cannot be counted in the analysis for "new value."[63]  Ms. Prill also asserts that several of the new value invoices (totaling $210,053.87) are not identified by a proper invoice number.[64]  Finally, she asserts that $26,415.22 of the invoices are for service charges that should not count as new value.[65]  Despite these "deficiencies," the Debtors concede that the new value defense shields all except approximately $1 million in preference liability.[66]

The Defendant argues that to prove its defense, it need only "track the debits and credits generally" to show the "net result."[67]  It contends that it has presented sufficient evidence

---

[62]    Adv. D.I. 73 at ¶¶ 4-10; Adv. D.I. 75 at Ex. 82.

[63]    Adv. D.I. 73 at ¶ 8.

[64]    Adv. D.I. 73 at ¶¶ 5-7, Ex. A.

[65]    Adv. D.I. 73 at ¶ 9.

[66]    Adv. D.I. 75 at Ex. 82 (showing that $1,076,557 remains of the net preference liability after subtracting new value).

[67]    Burtch v. Revchem Composites, Inc. (In re Sierra Concrete Design, Inc.), 463 B.R. 302, 307-08 (Bankr. D. Del. 2012) (granting summary judgment on new value defense after looking at similar analysis showing net result of transactions because the statute's "underlying economic principle [is] that the creditor made subsequent shipment of goods only because the debtor was

to do that, noting that the Debtors concede that the Defendant provided at least $3 million in new value.  The Defendant also contends that the Prill declaration should be excluded under Rule 37(c) because the Debtors never identified her as an expert witness, she never issued an expert report, and as a result, the Defendant never had an opportunity to depose her.[68]

The Court concludes that it need not consider the latter argument, because even considering the Prill declaration, the Defendant has established that the alleged preferential transfers remaining after application of the ordinary course of business defense are shielded from recovery by new value provided by the Defendant.  The Defendant presented credible evidence that it provided new value to the Debtors of $4,064,050.97.[69]  This is more than sufficient to cover the preferential transfers of

---

[68]    Fed. R. Civ. P. 37(c) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").  See Adv. D.I. 55 (stipulated scheduling order requiring disclosures and reports of the parties' rebuttal experts by July 31, 2023).

[69]    Adv. D.I. 66 at ¶ 21, Ex. 8 at 74.

paying for the earlier shipments.  Thus, one should and does look at the net result - the extent to which the creditor was preferred, taking into account . . . the new value the creditor extended to the debtor after repayment on old loans.  In making this analysis one need not link specific invoices to specific payments.  Rather, one need only track the debits and credits generally.").

$3,095,648.06 remaining after application of the ordinary course of business defense.  Even if the Court were to accept the assertions of Ms. Prill and deduct the service charges ($26,415.22), mis-numbered invoices $210,053.87), and new value provided outside the preference period ($539,523.93), the new value provided by the Defendant is still sufficient to cover all of the remaining alleged preferential transfers.  Therefore, the Court finds that the Debtors' evidence is insufficient to rebut Mr. Toppi's evidence of new value or to create a genuine issue of material fact.[70]

Consequently, the Court concludes that the Defendant has established that all of the alleged preferential transfers remaining after application of the ordinary course of business are exempt from avoidance under section 547(c)(4).  Accordingly, the Court will grant summary judgment for the Defendant on Count One of the Complaint.

    C.    Constructive Fraudulent Transfer Claim

The Debtors assert in Count Two of the Complaint that the transfers in question may also be avoided and recovered as constructively fraudulent transfers.  Section 548 of the Bankruptcy Code provides, in relevant part:

---

[70]    See Anderson, 477 U.S. at 248 (concluding that a dispute over a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). See also Miller v. Westfield Steel, Inc. (In re Elrod Holdings Corp.), 426 B.R. 106, 109 (Bankr. D. Del. 2010).

> (a)(1) The [debtor] may avoid any transfer . . . that
> was made or incurred on or within 2 years before the
> date of the filing of the petition, if the debtor
> voluntarily or involuntarily -
>> (B)(i) <u>received less than a reasonably
>> equivalent value in exchange for such
>> transfer or obligation</u> . . . .[71]

The Defendant argues that it is entitled to summary judgment on this claim because the transfers were made for reasonably equivalent value. "[I]t is well-settled that a 'transfer made in satisfaction of an antecedent debt or for an obligation for which the debtor was liable presumptively constitutes reasonably equivalent value.'"[72] The Defendant asserts that there is no dispute that the alleged fraudulent transfers were made to satisfy antecedent debts incurred by the Debtors through their purchases of medical supplies from the Defendant. The Defendant also contends that the Debtors have conceded that there is no basis for its fraudulent transfer claim by failing to present any evidence in support of it. Therefore, it argues that it is

---

[71]    11 U.S.C. § 548(a)(1)(B) (emphasis added).

[72]    <u>Burtch v. Salem Inv. Partners, III, LP (In re Parker Sch. Unifs., LLC)</u>, Adv. Proc. No. 19-50770(CSS), 2021 WL 4553016, at *7-9 (Bankr. D. Del. Oct. 5, 2021) (dismissing constructive fraudulent transfer claim where plaintiff alleged the payments were in satisfaction of obligations it owed). <u>See also</u> <u>Swift v. Halimi (In re CL H Winndown LLC)</u>, Adv. Pro. No. 23-50126 (JTD), 2023 WL 5740195, at *3 (Bankr. D. Del. Sept. 5, 2023) (dismissing fraudulent transfer claim because transfers made in satisfaction of unsecured notes were made for reasonably equivalent value).

entitled to summary judgment on that Count.[73]

The Debtors respond only briefly to this argument.  They contend that the Defendant should not be allowed to assert inconsistent affirmative defenses to the preference claims and to the fraudulent transfer claims.  They maintain that the Defendant is not entitled to summary judgment on the preference claims and may, therefore, assert other defenses to the preference, such as that the transfers were not for antecedent debts.  Therefore, the Debtors assert that in the event the Defendant does assert, and the Court finds, that the transfers were not in payment of antecedent debts, their alternative fraudulent transfer claim must survive.

The Court agrees that the Defendant is entitled to summary judgment on the fraudulent transfer claims.  The Debtors allege in the Complaint that the transfers in question were on account of prior antecedent debts.[74]  A transfer in payment of an antecedent debt is not fraudulent because it is given for reasonably equivalent value, namely satisfaction of a debt owed

---

[73]    See Mallinckrodt PLC v. City of Rockford (In re Mallinckrodt PLC), Adv. No. 21-50428(JTD), 2021 WL 2460227, at *4 (Bankr. D. Del. June 16, 2021) (granting summary judgment on claims that the defendant failed to address) (citing Pope v. Swanson, CA 07-652-GMS, 2009 WL 2507928, at *2 (D. Del. Aug. 17, 2009) (granting summary judgment on first two prongs of prima facie case because the defendants failed to address the plaintiff's arguments and thereby demonstrating that they were conceding the points)).

[74]    Adv. D.I. 1 at ¶¶ 31-32.

to the creditor.[75]

Accordingly, the Court will grant summary judgment in favor of the Defendant on Count Two of the Complaint.

D.   Counts Three and Four

In Counts Three and Four, the Debtors seek to recover the transfers in question (as preferential or constructively fraudulent) and to disallow all of the Defendant's claims until it has repaid those transfers under sections 550 and 502(d).[76] The Defendant argues that those claims are both dependent on the success of the preference and fraudulent transfer claims, which they contend the Debtors cannot establish.  In addition, the Defendant contends that it has filed no claim in the bankruptcy case,[77] so disallowance of its claims is moot.

The Debtors contend, however, that to the extent they are successful in avoiding any of the transfers at issue and the Defendant asserts any claim for those avoided transfers, they should have the right to seek disallowance of those claims.[78]

The Court will grant the Motion for summary judgment as to Counts Three and Four, because it has concluded above that the

---

[75]   See, e.g., Parker Sch. Unifs.,, 2021 WL 4553016, at *7-9; CL H Winddown, 2023 WL 5740195, at *3.

[76]   11 U.S.C. §§ 502(d) & 550.

[77]   Adv. D.I. 63 at ¶ 10; Adv. D.I. 65 at ¶ 17.

[78]   Adv. 72 at 3, n.5.

Defendant is entitled to judgment on both Counts One and Two.  As a result, the Debtors are not entitled to recover any of the alleged transfers and the Defendant will have no claim for any recovery of the transfers.

IV.  <u>CONCLUSION</u>

For the reasons set forth above, the Court will grant the Defendant's Motion for Summary Judgment on all Counts of the Debtors' Complaint.

An appropriate Order is attached.


Dated: August 27, 2024                    BY THE COURT:


                                          Mary F. Walrath
                                          United States Bankruptcy Judge